IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

THOMAS KLAUS and MATTHEW A.
KOLESAR,

Plaintiffs,

v.

DELTA APPAREL, INC. and SALT LIFE, LLC,

Defendants.

Civil Action No.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Thomas Klaus and Matthew A. Kolesar, by and through undersigned counsel, seek a permanent injunction requiring a change in Delta Apparel, Inc.'s ("Delta Apparel") and Salt Life, LLC's ("Salt Life") (collectively, "Defendants") corporate policies to cause their online stores to become, and remain, accessible to individuals with visual disabilities. In support thereof, Plaintiffs respectfully assert as follows:

## INTRODUCTION

1. In a September 25, 2018 letter to U.S. House of Representative Ted Budd, U.S. Department of Justice Assistant Attorney General Stephen E. Boyd confirmed that public accommodations must make the websites they own, operate, or control equally accessible to individuals with disabilities. Assistant Attorney General Boyd's letter provides:

> The Department [of Justice] first articulated its interpretation that the ADA applies to public accommodations' websites over 20 years ago. This interpretation is consistent with the ADA's title III requirement that the goods, services, privileges, or activities provided by places of public accommodation be equally accessible to people with disabilities.

*See* Letter from Assistant Attorney General Stephen E. Boyd, U.S. Department of Justice, to Congressman Ted Budd, U.S. House of Representatives (Sept. 25, 2018) (available at https://images.cutimes.com/contrib/content/uploads/documents/413/152136/adaletter.pdf) (last accessed Mar. 14, 2019).

2.      Thomas Klaus suffers from Leber hereditary optic neuropathy, or LHON, a genetic disorder that rendered him totally blind more than twenty years ago. He uses a screen reader to navigate the Internet.

3.      Matthew A. Kolesar suffers retinitis pigmentosa, a genetic disorder that left him totally blind when he was just twenty years old. Today, he uses screen reader technology, including VoiceOver with his iPhone 7, JAWS, and NVDA to navigate the Internet.

4.      Screen reader "software translates the visual internet into an auditory equivalent. At a rapid pace, the software reads the content of a webpage to the user." *Andrews v. Blick Art Materials, LLC*, 17-CV-767, 2017 WL 6542466, at \*6 (E.D.N.Y. Dec. 21, 2017) (J. Weinstein).

> The screen reading software uses auditory cues to allow a visually impaired user to effectively use websites. For example, when using the visual internet, a seeing user learns that a link may be "clicked," which will bring her to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an arrow symbol to a hand.
>
> The screen reading software uses auditory—rather than visual—cues to relay this same information. When a sight impaired individual reaches a link that may be "clicked on," the software reads the link to the user, and after reading the text of the link says the word "clickable."…Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a website by listening and responding with her keyboard.

*Id*. at \*6-7. *See* American Federation for the Blind, *Screen Readers*, *available at* http://www.afb.org/prodBrowseCatResults.aspx?CatID=49 (last accessed Mar. 14, 2019) (discussing screen readers and how they work).

5.    Defendants are retailers that sell clothing, footwear, sunglasses, and other accessories for men, women, and children.

6.    Consumers may research and purchase Defendants' products and access other brand-related content and services at www.coastapparel.com and www.saltlife.com (collectively, "Websites"), websites Defendants own, operate, and control.  *See* Delta Apparel and Salt Life, Privacy Policy, *available at* https://www.saltlife.com/privacy-policy and at https://coastapparel.com/pages/privacy-policy/ (last accessed Mar. 14, 2019) ("The… www.saltlife.com, www.coastapparel.com… websites are operated by Delta Apparel, Inc. and/or its affiliates Salt Life, LLC…").

7.    In addition to researching and purchasing Defendants' products and services from the comfort and convenience of their homes, consumers may also use Defendants' Websites to sign up for email and news, find nearby retailers that carry Defendants' products, contact customer service, and more.

8.    Defendants are responsible for the policies, practices, and procedures concerning the Websites' development and maintenance.

9.    Unfortunately, Defendants deny approximately 8.1 million Americans who have difficulty seeing access to their Websites' goods, content, and services because the Websites are largely incompatible with the screen reader programs these Americans use to navigate an increasingly ecommerce world. *See* Press Release, United States Census Bureau, Nearly 1 in 5 People Have a Disability in the U.S., Census Bureau Reports *Report Released to Coincide with 22nd Anniversary of the ADA* (Jul. 25, 2012), *available at* https://www.census.gov/newsroom/releases/archives/miscellaneous/cb12-134.html (last accessed Mar. 14, 2019) ("About 8.1 million people had difficulty seeing, including 2.0 million who were blind or unable to see.").

3

10.     Plaintiffs bring this civil rights action against Defendants to enforce Title III of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("Title III"), which requires, among other things, that a public accommodation (1) not deny persons with disabilities the benefits of their services, facilities, privileges and advantages; (2) provide such persons with benefits that are equal to those provided to nondisabled persons; (3) provide auxiliary aids and services—including electronic services for use with a computer screen reading program—where necessary to ensure effective communication with individuals with a visual disability, and to ensure that such persons are not excluded, denied services, segregated or otherwise treated differently than sighted individuals; and (4) utilize administrative methods, practices, and policies that provide persons with disabilities equal access to online content.

11.     By failing to make their Websites available in a manner compatible with computer screen reader programs, Defendants, public accommodations subject to Title III, deprive individuals who are partially sighted, visually impaired, or totally blind the benefits of the goods, content, and services available in their online stores—all benefits Defendants afford nondisabled individuals—thereby increasing the sense of isolation and stigma among these Americans that Title III was meant to redress.

12.     Because Defendants' Websites are not and have never been accessible, and because upon information and belief Defendants do not have, and have never had, an adequate corporate policy that is reasonably calculated to cause their Websites to become and remain accessible, Plaintiffs invoke 42 U.S.C. § 12188(a)(2) and seek a permanent injunction requiring that:

a)  Defendants retain a qualified consultant acceptable to Plaintiffs ("Approved Web Accessibility Consultant") who shall assist it in improving the accessibility of their Websites, including all third party content and plug-ins, so the goods and services on the Websites may be equally accessed and enjoyed by individuals with vision related disabilities;

b)  Defendants work with the Approved Web Accessibility Consultant to ensure that all employees involved in website and content development be given web accessibility training on a biennial basis, including onsite training to create accessible content at the design and development stages;

c)  Defendants work with the Approved Web Accessibility Consultant to perform an automated accessibility audit on at least a quarterly basis to evaluate whether Defendants' Websites may be equally accessed and enjoyed by individuals with vision related disabilities on an ongoing basis;

d)  Defendants work with the Approved Web Accessibility Consultant to perform end-user accessibility/usability testing on at least a quarterly basis with said testing to be performed by humans who are blind or have low vision, or who have training and experience in the manner in which persons who are blind use a screen reader to navigate, browse, and conduct business on websites, in addition to the testing, if applicable, that is performed using semi-automated tools;

e)  Defendants incorporate all of the Approved Web Accessibility Consultant's recommendations within sixty (60) days of receiving the recommendations;

f)  Defendants work with the Approved Web Accessibility Consultant to create a Web Accessibility Policy that will be posted on their Websites, along with an e-mail address, instant messenger, and toll free phone number to report accessibility-related problems;

g)  Defendants directly link from the footer on each page of the Websites, a statement that indicates that Defendants are making efforts to maintain and increase the accessibility of their Websites to ensure that persons with disabilities have full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of the Defendants through the Websites;

h)  Defendants accompany the public policy statement with an accessible means of submitting accessibility questions and problems, including an accessible form to submit feedback or an email address to contact representatives knowledgeable about the Web Accessibility Policy;

i)  Defendants provide a notice, prominently and directly linked from the footer on each page of the Websites, soliciting feedback from visitors to the Websites on how the accessibility of the Websites can be improved. The link shall provide a method to provide feedback, including an accessible form to submit feedback or an email address to contact representatives knowledgeable about the Web Accessibility Policy;

j)  Defendants provide a copy of the Web Accessibility Policy to all web content personnel, contractors responsible for web content, and Client Service Operations call center agents ("CSO Personnel") for the Websites;

k)  Defendants train no fewer than three of their CSO Personnel to automatically escalate calls from users with disabilities who encounter difficulties using the Websites. Defendants shall have trained no fewer than three of their CSO personnel to timely assist such users with disabilities within CSO published hours of operation. Defendants shall establish procedures for promptly directing requests for assistance to such personnel including notifying the public that customer assistance is available to users with disabilities and describing the process to obtain that assistance;

l)  Defendants modify existing bug fix policies, practices, and procedures to include the elimination of bugs that cause the Websites to be inaccessible to users of screen reader technology;

m)  Plaintiffs, their counsel, and their experts monitor the Websites for up to two (2) years after the Approved Mutually Agreed Upon Consultant validates the Websites are free of accessibility errors/violations to ensure Defendants have adopted and implemented adequate accessibility policies. To this end, Plaintiffs, through their counsel and their experts, shall be entitled to consult with the Approved Web Accessibility Consultant at their discretion, and to review any written material, including but not limited to any recommendations the Approved Website Accessibility Consultant provides Defendants.

13.    Web-based technologies have features and content that are modified on a daily, and in some instances an hourly, basis, and a one time "fix" to an inaccessible website will not cause the website to remain accessible without a corresponding change in corporate policies related to those web-based technologies. To evaluate whether an inaccessible website has been rendered accessible, and whether corporate policies related to web-based technologies have been changed in a meaningful manner that will cause the website to remain accessible, the website must be reviewed on a periodic basis using both automated accessibility screening tools and end user testing by disabled individuals.

## JURISDICTION AND VENUE

14.    The claims alleged arise under Title III such that this Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12188.

15.    Defendants attempt to, and indeed do so, participate in the Commonwealth's economic life by clearly performing business over the Internet. Through their Websites,

Defendants enter into contracts for the sale of their products with residents of Pennsylvania. These online sales contracts involve, and indeed require, Defendants' knowing and repeated transmission of computer files over the Internet. *See Gniewkowski v. Lettuce Entertain You*, Order, ECF No. 123 (W.D. Pa Apr. 25, 2017) *clarified by* Order of Court, ECF No. 169 (W.D. Pa. June 22, 2017) (Judge Schwab) (exercising personal jurisdiction over forum plaintiff's website accessibility claims against out-of-forum website operator); *see also Access Now Inc. v. Otter Products, LLC*, 280 F.Supp.3d 287 (D. Mass. Dec. 4, 2017) (same); *Access Now, Inc. v. Sportswear, Inc.*, 298 F.Supp.3d 296 (D. Mass. 2018) (same).

16.     As described in additional detail below, Plaintiff Kolesar was injured when he attempted to access Defendants' Websites from this District but encountered barriers that denied his full and equal access to the goods, content, and services available in Defendants' online stores.

17.     Venue in this District is proper under 28 U.S.C. § 1391(b)(2) because this is the judicial district in which a substantial part of the acts and omissions giving rise to Plaintiffs' claims occurred.

## PARTIES

18.     Plaintiff Kolesar is and, at all times relevant hereto, has been a resident of this District. Plaintiff Klaus is a resident of Harrisburg, Pennsylvania. Both Plaintiffs are and, at all times relevant hereto, have been totally blind and are therefore members of a protected class under the ADA, 42 U.S.C. § 12102(2) and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 *et seq*.

19.     Defendant Delta Apparel is a Georgia corporation with its principle place of business at 332 South Main Street, Greenville, SC 29601.

7

20.     Defendant Salt Life is a Georgia corporation with its principle place of business at 24 12th Street, Columbus, GA 31907.

## FACTS APPLICABLE TO ALL CLAIMS

21.     While the increasing pervasiveness of digital information presents an unprecedented opportunity to increase access to goods, content, and services for people with perceptual or motor disabilities, website developers and web content developers often implement digital technologies without regard to whether those technologies can be accessed by individuals with disabilities. This is notwithstanding the fact that accessible technology is both readily available and cost effective.

## DEFENDANTS' ONLINE CONTENT

22.     Defendants' Websites allow consumers to research and purchase Defendants' products from the comfort and convenience of their own homes, and arrange for home delivery. The Websites also enable consumers to sign up for email and news, find nearby retailers that carry Defendants' products, contact customer service, and more.

23.     Defendants are responsible for the policies, practices, and procedures concerning the Websites' development and maintenance.

## HARM TO PLAINTIFF

24.     Plaintiffs attempted to access the Websites with the screen reader auxiliary aids they use to navigate the Internet. Unfortunately, because of Defendants' failure to build their Websites in a manner that is compatible with screen reader programs, Plaintiffs are unable to understand, and thus are denied the benefit of, much of the content and services they wish to access on the Websites.

25.     Plaintiffs attempted to access the Websites using VoiceOver with iOS.

26.     VoiceOver is "a full-featured screen reader built into macOS that speaks the text in documents and windows, and describes aloud what appears on your screen…With VoiceOver, you control your Mac primarily with a keyboard, refreshable braille display, or trackpad. You use the VoiceOver cursor—which appears as a dark rectangular outline—to move around the screen, select buttons and other controls, and to read and edit text." *See* Apple, VoiceOver Getting Started Guide, *available at* https://help.apple.com/voiceover/info/guide/10.12/#/vo2681 (last accessed Mar. 12, 2018).



*The VoiceOver cursor—a dark rectangular outline—focused on the word "Accessibility" on screen.*

The italicized caption immediately above matches the alternative text that Apple provides in its VoiceOver Getting Started Guide. It illustrates the type of sufficiently descriptive alternative text that screen reader users require to fully and equally access Defendants' Website and Apps.



27.     Unfortunately, as a result of visiting Defendants' Websites, and from investigations performed on their behalf, Plaintiffs found Defendants' Websites to be largely unusable due to various barriers that deny them full and equal access to Defendants' online content and services. For example:

a.      The Websites do not provide a text equivalent for non-text elements. Providing text alternatives allows the information to be rendered in a variety of ways by a variety of users. A person who cannot see a picture, logo, or icon can have a text alternative read aloud using synthesized speech. For example, if customers to Defendants' online stores wish to submit a rievew, Defendants require they first answer a recaptcha security question. To answer the question successfully, Defendants' customers must first perceive the letters displayed visually in the green box, then type these letters in the text field 

provided. Unfortunately, Defendants do not provide a non-visual means of answering this security question. As a result, Plaintiffs cannot answer the questions independently, making them less likely to participate in this interactive feature than are Defendants' customers who are not partially sighted, visually impaired, or totally blind.

b.      The Websites use visual cues to convey content and other information to sighted users. Unfortunately, screen readers cannot interpret these cues and communicate the information they represent to individuals with visual disabilities. For example,  

consumers who perceive content visually will notice that many products available for purchase on Defendants' Websites include two prices. One price—a higher price—appears in strikethrough font. The other—a lower price—does not. These users will likely infer that the price appearing in strikethrough font is the "old" or "original" price, while the price appearing in regular font is the "new" or "sale" price. Unfortunately, Plaintiffs' screen readers cannot identify the meanings of these two fonts so that they can make an informed decision. Instead, Plaintiffs hear two prices for the same product, and cannot determine what they signify, like different quantities, colors, conditions, or in this case, sales. This uncertainty prevents Plaintiffs from making informed purchasing decisions, and increases the odds they will abandon the purchase process without making a selection at all.

c.      The Websites use color as the only visual means of conveying information, indicating an action, prompting a response, or distinguishing a visual element. Providing information conveyed with color through another visual means is necessary to ensure that users who cannot see color can still perceive this information. For example, Defendants Websites require customers to select the color and size of the product they wish to purchase. Defendants identify the selections visually by placing a blue border around them. Unfortunately, Defendants fail to include alternative text at these same elements to identify  selections in a non-visual means. Instead, Plaintiffs must tab backwards in order to determine whether their selections were successful. Because this backwards interaction is unpredictable, Plaintiffs are less likely than Defendants' other customers to verify their selections. In turn, this

11

uncertainty makes it more likely that Plaintiffs and other screen reader users abandon the purchase process before checking out successfully.

d.      The foreground and background color combinations of the Websites provide insufficient contrast. There are nearly three times more individuals with low vision than those with total blindness; and one out of twelve people has some sort of color deficiency. These users encounter difficulty distinguishing text from a background color if the contrast is insufficient.

e.      The Websites prevent visitors from resizing text without loss of content or functionality. As a result, individuals with mild visual disabilities cannot access information without assistive technology.

f.      Some functionality is not operable through a keyboard interface. As a result, individuals who cannot use a mouse are unable to access particular information and other content.

g.      The Websites prevent screen reader users who navigate sequentially through content from accessing primary content directly. For example, upon visiting Defendants' www.coastapparel.com website for the first time, Defendants present users with a pop-up window, inviting them to sign up for Defendant's email list. By doing so, users who perceive content visually can get 20% off a subsequent purchase. Unfortunately, the website does not alert Plaintiffs' screen readers to this pop-up window. As a result, Plaintiffs did not receive notice of this promotion, causing them to pay a 20% premium for using an auxiliary aid to shop in Defendants' online stores.



h.      Similarly, the Websites prevent screen reader users who navigate sequentially through content from accessing Defendants' instant messenger feature. Customers who perceive content visually will recognize a floating bubble with a Chat icon, and infer that by clicking it, they can speak with Defendants' customer service in real time. Unfortunately, because Defendants' accessibility policies fail to ensure the Websites are compatible with screen reader auxiliary aids, Plaintiffs cannot activate this feature by tabbing. As a result, they cannot contact Defendants' customer service for assistance with their online shopping experiences, making it even less likely that Plaintiffs troubleshoot the access barriers they encounter.



i.      The Websites provide a Size Chart that consumers may review to determine what size products to purchase. Size charts are particularly important to consumers who shop online because these consumers lack the opportunity to try on products, like the clothing that Defendants sell, before purchasing. Unfortunately, Defendants' Websites prevent Plaintiffs from tabbing to these Size Charts. Instead, their screen readers remain focused on the content of the Websites' underlying pages. As a result, Plaintiffs are unable to access the sizing information they require to confidently purchase a product that will fit, making it likely they abandon the online shopping experience before making a purchase



j.      Links and buttons on the Websites do not describe their purpose. As a result, blind users cannot determine whether they want to follow a particular link, making navigation an exercise of trial and error. For example, links throughout Defendants' www.saltlife.com website lack alternative text describing their purpose. Users who perceive content visually will likely recognize the Shopping Cart icon throughout www.saltlife.com, and understand that by clicking it, Defendants will redirect them to Defendants' online checkout platform. Unfortunately, these icons are not labeled. As a result, when Plaintiffs hover over them, their screen reader reads "link," only. Because this text is meaningless, Plaintiffs are less likely to complete a purchase successfully.



k.      The Websites provide a five-star rating for many products that Defendants sell. Users who perceive content visually can see whether a particular product has one, two, three, four, or five stars, and base their purchasing decisions on this information. Unfortunately, Defendants' accessibility policies, if any, fail to provide sufficiently descriptive alternative text for this important rating information. As a result, Plaintiffs must make their purchasing decisions without the benefit of knowing whether the products they're researching are well received by other consumers.



14

l.      Elements on the Websites do not have complete start and end tags, are not nested according to their specifications, and may contain duplicate attributes. As a result, screen readers cannot parse the webpages' content accurately.

m.      The Websites include user interface components, such as form elements and links, for which the name and role cannot be determined programmatically.

n.      The Websites include content subject to time limits  that prevent users with disabilities from reading and understanding the content, reacting or responding to certain prompts, or understanding screen layouts and controls. Users who perceive content visually will notice a pop-up window after placing an item in their shopping cart. Unfortunately, the Websites fail to notify screen reader users when these pop-up windows appear, making it impossible for Plaintiffs to access them before disappearing. Because they cannot access this "shortcut" to Defendants' payment platform, Plaintiffs must tab back to the top of a webpage in order to complete a purchase. This increases the rate of screen reader users' shopping cart abandonment.

o.      The Websites do not provide screen readers users a way to bypass blocks of content that are repeated on multiple webpages, such as navigation links, heading graphics, and advertising frames. As a result, unlike sighted users, individuals with a visual impairment cannot ignore the repeated material and must tab through unnecessary content to reach the item they want.

p.      The Websites fail to sufficiently describe the purpose of all headings. As a result, blind users will have significant difficulty understanding what information is contained on pages

15

and how that information is organized. When headings are clear and descriptive, users can find information they seek more easily, and they can understand the relationships between different pieces of content.

28.     These barriers, and others, deny Plaintiffs full and equal access to all of the services the Websites offer, and now deter them from attempting to use the Websites. Still, Plaintiffs would like to, and intend to, attempt to access the Websites in the future to research the products and services the Websites offer, or to test the Websites for compliance with the ADA.

29.     If the Websites were accessible, *i.e.* if Defendants removed the access barriers described above, Plaintiffs could independently research and purchase Defendants' products and access their other online content and services.

30.     Though Defendants may have centralized policies regarding the maintenance and operation of their Websites, Defendants have never had a plan or policy that is reasonably calculated to make their Websites fully accessible to, and independently usable by, individuals with vision related disabilities. As a result, the complained of access barriers are permanent in nature and likely to persist.

31.     The law requires that Defendants reasonably accommodate Plaintiffs' disabilities by removing these existing access barriers. Removal of the barriers identified above is readily achievable and may be carried out without much difficulty or expense.

32.     Plaintiffs have been, and in the absence of an injunction will continue to be, injured by Defendants' failure to maintain their online stores in a manner that is compatible with screen reader technology.

**DEFENDANTS' KNOWLEDGE OF ONLINE ACCESSIBILITY REQUIREMENTS**

33.     Defendants have long known that screen reader technology is necessary for individuals with visual disabilities to access their online content and services, and that it is legally responsible for providing the same in a manner that is compatible with these auxiliary aids.

34.     Indeed, the "Department [of Justice] first articulated its interpretation that the ADA applies to public accommodations' websites over 20 years ago." As described above, on September 25, 2018, Assistant Attorney General Stephen E. Boyd confirmed nothing about the ADA, nor the Department's enforcement of it, has changed this interpretation.

35.     More recently, the United States Court of Appeals for the Ninth Circuit confirmed the ADA applies to websites and mobile applications, equally. *See Robles v. Domino's Pizza, LLC, 913 F.3d 898 (9th Cir. 2019).*

**THE PARTIES HAVE NO ADMINISTRATIVE REMEDIES TO PURSUE**

36.     There is no DOJ administrative proceeding that could provide Plaintiffs with Title III injunctive relief.

37.     While DOJ has rulemaking authority and can bring enforcement actions in court, Congress has not authorized it to provide an adjudicative administrative process to provide Plaintiffs with relief.

38.     Plaintiffs allege violations of existing and longstanding statutory and regulatory requirements to provide auxiliary aids or services necessary to ensure effective communication, and courts routinely decide these types of effective communication matters.

39.     Resolution of Plaintiffs' claims does not require the Court to unravel intricate, technical facts, but rather involves consideration of facts within the conventional competence of the courts, *e.g.* (a) whether Defendants offer content and services on their Websites, and (b) whether Plaintiffs can access the content and services.

## SUBSTANTIVE VIOLATION

### Title III of the ADA, 42 U.S.C. § 12181 *et seq.*

40.      The assertions contained in the previous paragraphs are incorporated by reference.

41.      Defendants' Websites are a place of public accommodation within the definition of Title III of the ADA, 42 U.S.C. § 12181(7). *See Suchenko v. ECCO USA, Inc.*, 2018 WL 3933514, *3 (W.D. Pa. Aug. 16, 2018)* ("Simply put, Defendant in the instant case, like other corporate defendants in *Gniewkowski* and *Suchenko*, purportedly owns, operates, and/or controls the property upon which the alleged discrimination has taken place—i.e., its website. Therefore, Plaintiff in this case has a nexus to the place of public accommodation and thus may claim the protections of Title III.").

42.      In the broadest terms, the ADA prohibits discrimination on the basis of a disability in the full and equal enjoyment of goods and services of any place of public accommodation. 42 U.S.C. § 12182(a). Thus, to the extent Defendants do not provide Plaintiffs with full and equal access to their Websites, it has violated the ADA.

43.      In more specific terms, Title III of the ADA imposes statutory and regulatory requirements to ensure persons with disabilities are not excluded, denied services, segregated or otherwise treated differently than other individuals as a result of the absence of auxiliary aids and services. 42 U.S.C. § 12182(b)(2)(A); 28 C.F.R. §§ 36.303(a), (c). Under these provisions, public accommodations must furnish appropriate auxiliary aids and services that comply with their effective communication obligations. *Id.*

44.      Auxiliary aids and services are necessary when their absence effectively excludes an individual from participating in or benefiting from a service, or fails to provide a like experience to the disabled person.

45.     Auxiliary aids and services include, but are not limited to, audio recordings, screen reader software, magnification software, optical readers, secondary auditory programs, large print materials, accessible electronic and information technology, other effective methods of making visually delivered materials available to individuals who are blind or have low vision, and other similar services and actions. 28 C.F.R. §§ 36.303(b)(2), (4).

46.     In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability. 28 C.F.R. §§ 36.303(c)(1)(ii). To this end, the Ninth Circuit has explained, "assistive technology is not frozen in time:  as technology advances, [ ] accommodations should advance as well." *Enyart v. Nat'l Conference of Bar Examiners, Inc.*, 630 F.3d 1153, 1163 (9th Cir. 2011).

47.     By failing to provide their Websites' content and services in a manner that is compatible with auxiliary aids, Defendants have engaged, directly, or through contractual, licensing, or other arrangements, in illegal disability discrimination, as defined by Title III, including without limitation:

(a)     denying individuals with visual disabilities opportunities to participate in and benefit from the goods, content, and services available on their Websites;

(b)     affording individuals with visual disabilities access to their Websites that is not equal to, or effective as, that afforded others;

(c)     utilizing methods of administration that (i) have the effect of discriminating on the basis of disability; or (ii) perpetuate the discrimination of others who are subject to common administrative control;

(d)     denying individuals with visual disabilities effective communication, thereby excluding or otherwise treating them differently than others; and/or

(e)     failing to make reasonable modifications in policies, practices, or procedures where necessary to afford their services, privileges, advantages, or accommodations to individuals with visual disabilities.

48.     Defendants have violated Title III by, without limitation, failing to make their Websites' services accessible by screen reader programs, thereby denying individuals with visual disabilities the benefits of the Websites, providing them with benefits that are not equal to those they provide others, and denying them effective communication.

49.     Defendants have further violated Title III by, without limitation, utilizing administrative methods, practices, and policies that allow their Websites to be made available without consideration of consumers who can only access the companies' online goods, content, and services with screen reader programs.

50.     Making their online goods, content, and services compatible with screen readers does not change the content of Defendants' Websites nor result in making the Websites different, but enables individuals with visual disabilities to access the Websites Defendants already provide.

51.     Defendants' ongoing violations of Title III have caused, and in the absence of an injunction will continue to cause, harm to Plaintiffs and other individuals with visual disabilities.

52.     Plaintiffs' claims are warranted by existing law or by non-frivolous argument for extending, modifying, or reversing existing law or for establishing new law.

53.     Pursuant to 42 U.S.C. § 12188 and the remedies, procedures and rights set forth and incorporated therein, Plaintiffs request relief as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for:

(A)     A Declaratory Judgment that at the commencement of this action Defendants were in violation of the specific requirements of Title III of the ADA described above, and the relevant implementing regulations of the ADA, in that Defendants took no action that was reasonably calculated to ensure that their Websites are fully accessible to, and independently usable by, individuals with visual disabilities;

(B)     A permanent injunction pursuant to 42 U.S.C. § 12188(a)(2) and 28 CFR § 36.504(a) which directs Defendants to take all steps necessary to bring their Websites into full compliance with the requirements set forth in the ADA, and its implementing regulations, so that their Websites are fully accessible to, and independently usable by, blind individuals, and which further directs that the Court shall retain jurisdiction for a period to be determined to ensure that Defendants have adopted and is following an institutional policy that will in fact cause it to remain fully in compliance with the law—the specific injunctive relief requested by Plaintiffs is described more fully in paragraph 12 above.

(C)     Payment of actual, statutory, and other damages, as the Court deems proper;

(D)     Payment of costs of suit;

(E)     Payment of reasonable attorneys' fees, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505, including costs of monitoring Defendants' compliance with the judgment (*see Gniewkowski v. Lettuce Entertain You Enterprises, Inc.*, Case No. 2:16-cv-01898-AJS (W.D. Pa. Jan. 11, 2018) (ECF 191); *see also Access Now, Inc. v. Lax World, LLC*, No. 1:17-cv-10976-DJC (D. Mass. Apr. 17, 2018) (ECF 11);

(F)     Whatever other relief the Court deems just, equitable and appropriate; and

(G)     An Order retaining jurisdiction over this case until Defendants have complied with

the Court's Orders.

Dated: March 14, 2019                     Respectfully Submitted,

                                          */s/ R. Bruce Carlson*
                                          R. Bruce Carlson
                                          bcarlson@carlsonlynch.com
                                          Kevin W. Tucker
                                          ktucker@carlsonlynch.com
                                          **CARLSON LYNCH, LLP**
                                          1133 Penn Avenue, 5th Floor
                                          Pittsburgh, PA 15222
                                          Phone: (412) 322.9243

                                          *Counsel for Plaintiffs*